UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

CEDRIC CAÑAS MAILLARD

Defendant.

Case No.

ECF CASE

Jury Trial Demanded

COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges as follows:

SUMMARY OF THE ACTION

1.     This matter involves insider trading by Defendant Cedric Cañas Maillard ("Cañas"), a Spanish citizen, in the securities of Potash Corporation of Saskatchewan Inc. ("Potash"), a Canadian company that controls 20% of the global potash supply.

2.     During 2010, Cañas was a high-ranking official at Banco Santander, S.A. ("Santander"), headquartered in Madrid, Spain and the largest bank in the Eurozone.  Until he was terminated in January 2011, Cañas served as an adviser to Santander's Chief Executive Officer ("CEO").

3.     On August 5, 2010, while working in Santander's offices in Madrid, Spain, Cañas learned that Santander had been asked by BHP Billiton ("BHP"), the world's largest mining company by revenue, to serve as a financial advisor and help underwrite BHP's confidential, proposed acquisition of Potash.  On August 9, 2010, Cañas learned that Santander had approved

Case 1:15-cv-06380-RA   Document 1   Filed 08/13/15   Page 2 of 17

the financing commitment for the potential Potash acquisition.  On August 11, 2010, Cañas and

two Santander deal team executives attended a lunch meeting, during which they discussed

specific details about the pending Potash acquisition.

4.      On August 17, 2010, Potash publicly announced that its Board of Directors

("Board") had received and rejected an unsolicited $38.6 billion dollar offer to purchase Potash's

common stock for $130 per share, a 16% premium to Potash's closing price on the previous day.

Even though Potash rejected BHP's tender offer, the share price for Potash stock soared, closing

on August 17, 2010 at $143.17, up $31.02, or more than 27%, from the previous day's close.

The next day, BHP publicly disclosed that it had commenced an almost $40 billion tender offer

for all of the issued and outstanding common shares of Potash.

5.      On July 30, 2013, the Commission sued Cañas and his close, personal friend,

Julio Marín Ugedo ("Marín"), a Spanish citizen, for insider trading in Potash securities.  *See SEC*

*v. Canas, et al.*, 13-cv-5299 (S.D.N.Y.)  As alleged in the Commission's Complaint, between

August 9 and August 13, 2010, Cañas purchased the equivalent of 30,000 shares of Potash

common stock through highly-leveraged securities known as Contracts-for-Difference ("CFDs").

Cañas also informed his friend Marín about the potential acquisition and advised him to trade.

Marín purchased 1,393 shares of Potash stock between August 10 and 12, 2010.  On August 17,

2010, Cañas liquidated his entire CFD position in Potash and realized a net profit of

$917,239.44.  On August 17th and 19th, Marín sold his own shares of Potash stock for a net

profit of $43,566.50.

6.      The Commission settled its claims against Cañas with respect to his Potash CFD

trades and Marín's Potash stock trades.  On July 18, 2014, the Court entered a Final Judgment,

upon consent, permanently enjoining Cañas from violating Sections 10(b) and 14(e) of the

Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5 and 14e-3 thereunder and ordering him to pay disgorgement in the amount of $960,806—comprising Cañas's and Marín's ill-gotten trading profits—and a civil penalty of $960,806 in connection with the trades that were the subject of the Commission's prior Complaint. In his signed Consent, Cañas acknowledged that the settlement resolved "only the claims against [Cañas] in this civil proceeding related to the specific trades identified in the SEC's Complaint," which were the 30,000 Potash CFDs that Cañas traded and the 1,393 Potash shares that Marín traded.

7.      After the settlement, the Commission staff continued to investigate certain other suspicious Potash trades in foreign accounts whose owners were not known at that time. The Commission staff obtained evidence a few weeks ago revealing that Cañas was the sole beneficial owner of a Switzerland-based account and had coordinated with another close, personal friend to purchase 135 Sept $125 Potash call options in that account on August 16, 2010, one day before the public announcement of the proposed acquisition. Those trades were not part of the prior action against or settlement with Cañas. The Potash call option purchase was executed over the Chicago Board Options Exchange ("CBOE") in Chicago, Illinois.

8.      On August 19th, two days after the deal was announced, Cañas's account sold all 135 Sept $125 Potash call options and realized net profits of $278,156.97, or a gain of 1,476.18%, in just three days.

9.      By knowingly and recklessly engaging in the conduct described in this Complaint, Cañas violated Sections 10(b) and 14(e) of the Exchange Act and Rules 10b-5 and 14e-3 thereunder.

10.      The Commission brings this second action to obtain disgorgement of Cañas's ill-gotten gains and a civil penalty for his insider trading in the Switzerland-based account.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e), 78u-1, and 78aa]. Defendant has directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)(3) and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  As discussed herein, Defendant Cañas, a foreign citizen who lives in Madrid, Spain, owned an apartment and transacted business in this judicial district and engaged in acts, practices, and courses of business constituting violations of the federal securities laws within the jurisdiction of the United States District Court for the Southern District of New York and elsewhere within the United States.

## DEFENDANT

13.     **Cedric Cañas Maillard**, age 42, is a Spanish citizen who currently resides in Madrid, Spain.  From May 1, 2008 through January 2011, Cañas served as the Technical Cabinet Adviser to Santander's CEO.  Cañas has an MBA from Harvard Business School.  Between the summer of 1998 and January 2008, Cañas periodically lived and worked in the United States, and he has a U.S. social security number.  He also travelled to the United States thereafter.  Until 2014, Cañas owned an apartment in New York City.  Until at least 2015, Cañas maintained bank and brokerage accounts in the United States.

## RELATED ENTITIES

14.     **Potash Corp. of Saskatchewan Inc.** is a Canadian company headquartered in Saskatoon, Saskatchewan, Canada.  Potash is the world's largest producer of potash by capacity, the world's third largest producer of phosphates by capacity, and the third largest nitrogen

4

producer worldwide by ammonia capacity.  Nitrogen, potash, and phosphates are the three primary crop nutrients used to produce fertilizer.  Potash controls 20% of the global potash supply.  Potash stock trades on the New York Stock Exchange ("NYSE") and the Toronto Stock Exchange, and its options are listed and trade on the CBOE and other U.S. options exchanges.

15.     **BHP Billiton** is an Anglo-Australian multinational mining, oil, and gas company and is the world's largest mining company by revenue.  BHP's global headquarters are located in Melbourne, Australia.

16.     **Banco Santander, S.A.**, the largest bank in the Eurozone, is headquartered in Madrid, Spain.  During 2010, Santander served as a financial advisor and potential underwriter to BHP in connection with BHP's proposed acquisition of Potash.

## FACTS

### A.     BHP Makes an Offer to Acquire Potash

17.     On August 3, 2010, BHP's CEO contacted the President and CEO of Potash to request a meeting during the week of August 9, 2010, and a face-to-face meeting was scheduled for August 12, 2010 in Chicago, Illinois.  At that time, BHP's CEO did not disclose the purpose of the meeting to the President and CEO of Potash.

18.     On August 4, 2010, BHP approached Santander and inquired whether Santander could support a $10.5 billion portion of the underwriting in connection with BHP's confidential, proposed acquisition of Potash.  BHP told Santander that it needed a response by August 11, 2010.  Later on August 4, 2010, BHP and Santander executed confidentiality agreements, and Santander assembled a team to conduct due diligence and determine whether it could support the underwriting.

19.     On August 9, 2010, Santander's Executive Committee met and formally approved

the proposed $10.5 billion underwriting commitment. A few hours later, Santander executives communicated the firm's financing commitment to BHP's Chief Financial Officer at a meeting in Madrid.

20.     On August 12, 2010, BHP's CEO met with Potash's CEO and presented BHP's proposal to acquire Potash for a total of $38.6 billion. Potash's CEO responded that Potash was "not for sale." Nevertheless, that same day BHP delivered letters to Potash summarizing the acquisition proposal, and setting forth BHP's financing facilities, the due diligence conducted, and certain undertakings that BHP would be prepared to take in connection with the proposed acquisition.

21.     On August 13th, Potash's Board met to discuss the BHP offer and retained advisors to analyze the proposed acquisition. Three days later, on August 16, 2010, Potash's Board convened and voted to reject the offer.

22.     On August 17, 2010, Potash informed BHP that the acquisition proposal grossly undervalued Potash and that the acquisition did not serve the best interests of the company's shareholders.

23.     That same day, Potash publicly announced that its Board had received and rejected BHP's unsolicited offer to purchase the common stock of Potash for $38.6 billion, or $130 per share in cash, which amounted to a 16% premium to the closing price of Potash's stock on the previous day.

24.     Following the announcement, on August 17, 2010, Potash's share price soared, closing at $143.17, up $31.02, or 27.7%, from the previous day's closing price.

25.     The next day, BHP publicly disclosed that it had commenced an almost $40 billion hostile bid for all of the issued and outstanding common shares of Potash.

26.     Potash opposed BHP's hostile bid, filed a lawsuit to enjoin the takeover, and asked the Canadian government to intervene.  The Canadian government eventually opposed the offer from BHP, and the proposed acquisition never took place.

**B.     Cañas Acquires Material, Nonpublic Information**

27.     On or about August 5, 2010, Santander's Global Head of Corporate and Investment Banking ("Global Head of CIB") instructed Santander's Head of European Loans to draft a detailed memorandum regarding BHP's potential acquisition of Potash and the financing commitment requested from Santander ("Acquisition Memo").  Thereafter, Santander's Head of European Loans and Santander's Junior Product Specialist for UK Loans ("Junior Product Specialist") drafted the Acquisition Memo.  The purpose of the Acquisition Memo was to gain the CEO's support for the underwriting engagement at an upcoming meeting of Santander's Executive Committee.

28.     The Acquisition Memo described, among other things, BHP's request that Santander provide $10.5 billion in financing for BHP's proposed $45 billion Potash acquisition, with most of the remaining amount dispersed among three other banks.  The memo stated that the proposal was highly confidential and that the information had not been shared with the acquisition target.

29.     The memo further stated that Santander needed to provide its financing guarantee by August 11, 2010 so that BHP could immediately communicate the offer to Potash and commence negotiations.  The memo also indicated that BHP would launch the deal, either through a friendly or hostile bid, no later than the first week of September 2010.

30.     On August 5, 2010, Santander's Global Head of CIB sent Santander's CEO an e-mail attaching the Acquisition Memo.  Santander's Global Head of CIB also sent an e-mail to the

7

Head of European Loans and directed him to forward the Acquisition Memo to Cañas.

31.     That day, Santander's Head of European Loans e-mailed a copy of the Acquisition Memo to Cañas.  Later that night, Santander's Head of European Loans called Cañas and discussed the proposed Potash acquisition with him.

32.     On August 9, 2010, Santander's Head of European Loans informed Cañas that the $10.5 billion financing commitment requested by BHP had been approved by Santander's Executive Committee.

33.     On August 11, 2010, Cañas attended a lunch meeting with Santander's Head of European Loans and the Junior Product Specialist.  During that lunch meeting, the three Santander executives discussed the Potash acquisition, including the timing of the deal.

34.     In addition to these discussions, on a number of other occasions between August 5 and August 17, 2010, at least four Santander executives, including Santander's CEO, discussed BHP's proposal and the status of the potential Potash acquisition with Cañas.

C.     **Cañas Violates Santander's Insider Trading Policies**

35.     During the period of time at issue in this case, Santander had a Code of Conduct in Securities Markets ("Code of Conduct"), which governed the personal securities trading of covered employees.

36.     The Code of Conduct required all covered Santander employees to execute their personal securities transactions through Santander Group institutions and report their personal trading shortly after the end of each calendar month.

37.     In addition, the Code of Conduct mandated that covered Santander employees notify the firm's compliance department whenever they acquire sensitive information, such as information concerning a proposed merger/acquisition.  The Code of Conduct also prohibited

covered Santander's employees from using confidential client information to trade or recommend that others trade securities.

38.     Cañas executed Santander's Code of Conduct on October 27, 2009, and he violated the Code of Conduct in a variety of ways in connection with the proposed Potash acquisition.

39.     Cañas never reported to Santander that he learned about the pending Potash acquisition.  In addition, Cañas traded Potash securities in his account outside the Santander Group.  And Cañas never reported his Potash trades to Santander.

40.     As described below, Cañas also violated Santander's Code of Conduct by purchasing for himself, and recommending that at least one other person purchase, Potash securities based upon his knowledge of the proposed Potash acquisition.

**D.      Cañas Purchases Potash Securities Based on Material, Nonpublic Information**

41.     On August 16, 2010, based upon material, nonpublic information about the potential Potash acquisition, Cañas coordinated with a close, personal friend to purchase 135 Sept $125 Potash call options in a Switzerland-based brokerage account of which Cañas was the sole beneficial owner.  The purchase of these call options occurred one day before the proposed acquisition was announced to the public.  Potash call options are U.S.-exchange listed securities and trade at the CBOE and other U.S. options exchanges.

42.     Equity call options, such as those traded in Cañas's account, give the buyer the right, but not the obligation, to purchase a company's stock at a set price (i.e., the "strike price") for a certain period of time (i.e., through "expiration").  In general, one buys a "call option" or "call" when the stock price is expected to rise, or sells a call when the stock price is expected to fall.  For example, in 2010, one "Sept $125" call option on Potash stock would give the

purchaser the right to buy 100 shares of Potash stock for $125 per share before the call expired on September 18, 2010.  If Potash stock went above $125 before the call expired, the owner could either exercise the call and acquire the stock at $125 per share, or sell the call, which would have increased in value.  If Potash's stock price failed to reach $125 per share before the call expired, and the holder had not sold the call option, the call would expire worthless.  Generally, at any time before the options expire, the owner of the options can sell them at their current market value (which is significantly influenced by, among other things, the stock price at the time).

43.     If at the time of purchase, the call option's strike price is above the price at which the stock is then trading, the call option is said to be "out-of-the money" because it would be unprofitable to exercise the call and pay more for the stock than could be paid if the shares were purchased on a stock market.  Out-of-the money call options are cheaper to buy than those that are conversely "in-the-money" and provide the buyer an opportunity to increase his leverage to benefit if the stock price increases in the future.

44.     Cañas's Potash call options were purchased through a brokerage account at Bank Julius Bär & Co AG ("Julius Bär"), a Swiss brokerage firm based in Zurich, Switzerland.  The account was opened on or about July 30, 2010 in the name of a Portuguese consulting firm based in Portugal ("Portuguese Firm A").  On the same day, Portuguese Firm A submitted forms to Julius Bär identifying Cañas as the sole beneficiary of the brokerage account.  Brokerage account documents reflect that Portuguese Firm A falsely represented to Julius Bär that Cañas was a former management employee of Banco Santander who was not currently employed, when in fact, he was at the time, the Technical Cabinet Adviser to Santander's CEO.

45.     Cañas's close, personal friend ("Friend A"), a Spanish lawyer and a Director of

Portuguese Firm A, was listed as one of two authorized signatories on the account. After the account had been opened, Portuguese Firm A also submitted documents to Julius Bär authorizing Cañas to make trades and obtain account information. An individual whose name began with the letter N ("Account Rep. N") was one of the Julius Bär brokerage account representatives assigned to the account.

46.     Prior to purchasing the Potash call options, Friend A arranged for €14,985.00 (or $19,180.80) to be wired into the brokerage account from Portuguese Firm A's bank account at Banif-Banco Internacional Do Funcha, located in Portugal.[1]  Although the transfer was ordered several days earlier, the funds did not clear until August 16, 2010—one day before the Potash public announcement.

47.     Cañas and Friend A rushed to fund the brokerage account and place options trades days prior to the public announcement.  On August 11, 2010, at 10:57:22 Madrid time, Friend A sent a text message to Cañas (in Spanish) telling him, among other things, that he had ordered a transfer from the Portuguese, and he asked Cañas to let him know if Cañas was doing more so that he could advise Account Rep. N.  Friend A also told Cañas that he had blind-copied Cañas on his e-mail correspondence with Account Rep. N, with whom Friend A was communicating about trading in the account.

48.     On August 12, 2010, at 14:35:38 Madrid time, Friend A wrote to Cañas that the transfer had not yet arrived, but that he would contact Cañas as soon as it had.  Seven minutes later, Cañas acknowledged receipt of the text.

49.     On Friday, August 13, 2010, at 19:33 Madrid time, Friend A wrote an e-mail to Account Rep. N and another Julius Bär account representative concerning the wire transfer and

---

[1] The wire request was in the amount of €15,000, but there was a €15.00 transaction fee.

the prospective Potash trades.  In that e-mail, among other things, Friend A stated that it was very urgent for the account representatives to confirm whether they had received the first wire transfer from Portugal, and that otherwise, the account representatives should directly contact the Portuguese bank.  Friend A explained to the account representatives (in Spanish) that "we have detected an opportunity in the American market," in which "we" would need to trade tomorrow between 15:30 and 22:00.  Friend A apologized for being pushy, but he said that it was important that they be able to do the trade the next day.

50.    On Monday, August 16, 2010—the next trading day after August 13th—at 13:49:36 Madrid time, Cañas sent a text message to Friend A stating, among other things, that he had spoken to "N," who told him that only "14" had come into the account, which was an error by the Portuguese that might be resolved that day, or the next day at the latest, if they hurried. Cañas also told Friend A that he had already done something.  He apologized to Friend A for being a pain, but he said that Friend A would understand why.

51.    Less than two hours later, at 15:30 Madrid time, Account Rep. N e-mailed Friend A to confirm that the €14,985 wire transfer had been received for the brokerage account. Account Rep. N also informed Friend A that he could directly call Account Rep. N or another colleague to place the trades.

52.    Shortly thereafter, on August 16, 2010, at 16:12:35 Madrid time (10:12:35 a.m. EST), the account paid $1.380/contract or $18,630.00 to purchase 135 Sept $125 Potash call options, using all but approximately $338 of the funds that had just been wired into the account. The account also paid $213.03 in commissions to purchase the Potash call options.  The Potash call option purchase was executed over the CBOE.

53.    On August 16, 2010, Potash's stock traded on the NYSE between $110.57 and

$112.77 per share, which was below the strike price on Cañas's Potash call options.  Thus, the 135 Sept $125 Potash calls were out-of-the money by $12.23 to $14.43.

54.     The next morning, on August 17, 2010, Potash announced that its Board had received and rejected BHP's proposed acquisition bid.  Potash's stock opened on the NYSE at $143.11, an increase of $30.96 per share, or 27.61% over the previous day's closing price.  Cañas's Potash Sept $125 call options were now in-the-money and worth much more than when he purchased them on the previous day.

55.     On August 17, 2010—the day of the Potash announcement—Cañas and Friend A exchanged text messages complaining about an error that the Portuguese had made, presumably with respect to the wire transfer.

56.     On August 19, 2010, the account sold all 135 Sept $125 Potash call options for $22/contract and realized net profits of approximately $278,156.97, or a gain of 1,476.18% in just three days.  The Potash call option sale was executed over the CBOE.  That day, Cañas texted Friend A that he had spoken to Account Rep. N, who was changing everything to U.S. dollars, and that the transaction had closed with positive "278"—the amount of his approximate $278,000 gain from the Potash options trades.

57.     Several days after the trades, on August 25, 2010, Account Rep. N forwarded an article to Friend A relating to the Commission's first Potash insider trading action against two other Spanish citizens that was filed in the United States District Court for the Northern District of Illinois.  *See SEC v. Garcia et al.*, 10-cv-5268 (N.D. Ill.)  Friend A responded from his law firm e-mail address that Account Rep. N should, from that point forward, correspond with him through his personal Yahoo e-mail account.

58.     On August 27, 2010, in response to a request from Friend A to draw on a line of

credit from the brokerage account, Account Rep. N emailed him that, in view of the

Commission's first Potash insider trading case, a soft block had been placed on the account.

E.     **The Commission's Prior Action Against Cañas**

59.     On July 30, 2013, the Commission sued Cañas and his close, personal friend,

Marín, a Spanish citizen, for insider trading in Potash securities. *See SEC v. Canas, et al.*, 13-cv-

5299 (S.D.N.Y.)  As alleged in the Commission's Complaint, between August 9 and August 13,

2010, Cañas purchased the equivalent of 30,000 shares of Potash common stock through highly-

leveraged securities known as CFDs.  Cañas also informed his friend Marín about the potential

acquisition and advised him to trade.  Marín purchased 1,393 shares of Potash stock between

August 10 and 12, 2010.  On August 17, 2010, Cañas liquidated his entire CFD position in

Potash and realized a net profit of $917,239.44.  On August 17th and 19th, Marín sold his own

shares of Potash stock for a net profit of $43,566.50.

60.     The Commission settled its claims against Cañas with respect to his Potash CFD

trades and Marín's Potash stock trades.  On July 18, 2014, the Court entered a Final Judgment,

upon consent, permanently enjoining Cañas from violating Sections 10(b) and 14(e) of the

Exchange Act and Rules 10b-5 and 14e-3 thereunder and ordering him to pay disgorgement in

the amount of $960,806—comprising Cañas's and Marín's ill-gotten trading profits—and a civil

penalty of $960,806 in connection with the trades that were the subject of the Commission's

prior Complaint.  In his signed Consent, Cañas acknowledged that the settlement resolved "only

the claims against [Cañas] in this civil proceeding related to the specific trades identified in the

SEC's Complaint," which were the 30,000 Potash CFDs that Cañas traded and the 1,393 Potash

shares that Marín traded.

61.     On July 24, 2015, the Court granted the staff's motion for default judgment

against Marín.  The Court issued a Final Judgment permanently enjoining Marín from violating

Sections 10(b) and 14(e) of the Exchange Act and Rules 10b-5 and 14e-3 thereunder and

ordering him to pay a civil penalty in the amount of $130,698.

## CLAIMS FOR RELIEF

### CLAIM I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

62.    The Commission realleges and incorporates by reference each and every

allegation in paragraphs 1-61, inclusive, as if they were fully set forth herein.

63.    The information communicated to Cañas about the potential Potash acquisition

was both material and nonpublic.  The information was considered confidential by Santander,

Cañas's employer, and Santander's client, BHP, and Santander had policies protecting its own

and its clients' confidential information.

64.    Cañas learned the inside information that he used to make the securities

transactions alleged herein during the course of his employment, and Cañas knew or recklessly

disregarded that he, directly, indirectly, or derivatively, owed a fiduciary duty, or obligation

arising from a similar relationship of trust and confidence, to keep the information confidential.

65.    Cañas deliberately or recklessly used the inside information to place trades in his

personal account.

66.    At all times relevant to this Complaint, Defendant Cañas acted knowingly or

recklessly.

67.    By virtue of the foregoing, Defendant Cañas, in connection with the purchase or

sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the

mails, or a facility of a national securities exchange, directly or indirectly:

        a)   employed devices, schemes, or artifices to defraud;

15

    b)  made untrue statements of material fact or omitted to state materials facts

necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading; or

    c)  engaged in acts, practices, or courses of business which operated or would

have operated as a fraud or deceit upon persons.

68.    By reason of the foregoing, Defendant Cañas, directly or indirectly violated

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5],

thereunder.

## CLAIM II
### Violation of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder

69.    The Commission realleges and incorporates by reference each and every

allegation in paragraphs 1-68, inclusive, as if they were fully set forth herein.

70.    By at least August 5, 2010, substantial steps had been taken to commence a tender

offer for the securities of Potash by BHP, which was publicly announced on August 17, 2010.

71.    Prior to the public announcement of the tender offer for Potash, and after a

substantial step or steps to commence such tender offer had been taken, Defendant Cañas, while

in possession of material information relating to such tender offer, which information he either

knew or had reason to know was nonpublic and had been acquired directly or indirectly from the

offering company, the issuer, or any officer, director, partner, employee, or any other person

acting on behalf of the offering company or issuer, purchased or sold or caused to be purchased

or sold securities of Potash.

72.    By reason of the foregoing, Defendant Cañas violated Section 14(e) of the

Exchange Act [15 U.S.C. § 78n(e)] and Exchange Act Rule 14e-3 [17 C.F.R.§ 240.14e-3]

thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final

Judgment:

### I.

Ordering Defendant to disgorge all ill-gotten gains or unjust enrichment he derived from

the activities set forth in this Complaint, together with prejudgment interest thereon;

### II.

Ordering Defendant to pay a civil penalty pursuant to Section 21A of the Exchange Act

[15 U.S.C. § 78u-1]; and

### III.

Granting such other and further relief as this Court may deem just, equitable, or necessary

in connection with the enforcement of the federal securities laws and for the protection of

investors.

### JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, the Commission demands

that this case be tried before a jury.

Respectfully submitted,

**SECURITIES AND EXCHANGE
COMMISSION**

By: _Frank Goldman_
Frank D. Goldman (GoldmanF@sec.gov)
Kathryn A. Pyszka (PyszkaK@sec.gov)
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
Tel.: (303) 844-1000
Fax: (303) 295-0538

*Attorneys for the Plaintiff*